## Chesapeake & Ohio Railway Company v. Friend.

(Decided September 29, 1914.)

### Appeal from Floyd Circuit Court.

1. Carriers—Carriage of Passengers—Ejection of Passengers and Intruders—Failure to Pay Fare.—If a passenger fails to produce a ticket or to pay fare, the carrier has the right to eject him, using no more force than is reasonably necessary for that purpose.
2. Carriers—Carriage of Passengers—Ejection of Passengers and Intruders—Tender or Payment of Fare to Avoid Ejection.—The general rule is that where a passenger has been in part expelled from a train, as where the carrier's servants have signalled for the stopping of the train, the passenger cannot then tender a ticket. or offer to pay fare and thus entitle himself to transportation and thereby make his expulsion wrongful. However, where the passenger was asleep and the conductor after trying to awaken him, took him out on the platform of the coach for the purpose of ejecting him, and there the passenger became awake, it might be claimed with some show of reason that, under such circumstances, it would be the duty of the carrier to desist from the ejection upon the tender of a ticket or offer to pay fare. But where no ticket was ever tendered and no offer to pay fare was ever made by the passenger, the ejection was within the carrier's rights.

WORTHINGTON, COCHRAN & BROWNING and HARKINS & HARKINS for appellant.

MAY & MAY for appellee.

..OPINION OF THE COURT BY JUDGE HANNAH—Reversing.

C. E. Friend sued the Chesapeake & Ohio Railway Company in the Floyd Circuit Court to recover damages for an alleged wrongful expulsion of plaintiff from one of defendant company's passenger trains. The jury returned a verdict in his favor in the sum of one thousand dollars. The railroad company appeals.

Friend testified that he was a resident of Prestonsburg in Floyd County; that his age was thirty-four years; that on December 21, 1911, he went from Prestonsburg to Catlettsburg on one of defendant company's passenger trains; that he bought a round-trip ticket, and the return portion thereof he produced upon the trial of this action. He arrived in Catlettsburg about eleven o'clock a. m. and spent the afternoon of the 21st and all of the 22nd in Catlettsburg and Huntington, a near-

by city, taking a few drinks of intoxicants from time to time. On the afternoon of the 22nd of December, he returned to Catlettsburg, where he encountered an acquaintance, and they remained together until about three o'clock on the morning of the 23d, taking as plaintiff testified, "a few drinks along through the day and along that night." Between two and three o'clock on the morning of the 23d, plaintiff lay down for a short nap, but arose in time to obtain another drink and get to the passenger depot at seven o'clock that morning, where he boarded one of defendant company's passenger trains en route to his home, with seven or eight quarts of whiskey in his grip, intended, plaintiff says, "for some other parties, and some for myself and some for my wife, and I don't remember whether there was seven or eight quarts in my grip." After he boarded the train, and just after the train had left Catlettsburg, Friend became engaged in a conversation with a Rev. Mr. Ackman, District Superintendent of the M. E. Church. This conversation was of such character as to attract the attention of Rev. O. F. Williams, a Presiding Elder of the M. E. Church, South, who was also a passenger thereon. The latter testified that Friend was quite talkative and acted like most folks do when under the influence of intoxicants; that he didn't seem to be a bit out of humor; on the contrary, he seemed to be in a mighty good humor, good-natured, talkative and liberal, and in fact was what the witness would call drunk. This witness, in answer to a question as to the subject-matter of the conversation which drew his attention, said: "I think Mr. Ackman and Mr. Friend were going to build churches; in two or three instances Mr. Friend was making very liberal subscriptions, telling him how nice it was to build churches and how to go about it."

Plaintiff testified that he was not drunk; that after having some conversation with friends, he sat down in a seat, pulled his hat down over his face, leaned his head over in the window and was soon asleep; that he remained asleep until the train reached a station called Walbridge, about thirty miles from Catlettsburg, and that when he awoke, the conductor had him out on the platform of the coach; that he supposed the "outside air" caused him to awake. He testified that he said to the conductor "Gentlemen, you are making a mistake; I don't want off here; I am going to Prestons-

burg;" that the conductor then said to him (as near as he could remember, he would not say positively), "By God, we want you off;" that he then stepped off and looked back at the conductor and said to him, "By God, I am off."

He further testified that after the train passed on, he looked up the track and saw some ladies and gentlemen standing there, and that he walked up to them and asked them if they knew why he had been put off of the train; that they said they did not know he had been put off; that he then asked them how far it was to Louisa, and they said it was three miles; that he then walked to Louisa, remained there until the evening train and then took passage to his home in Prestonsburg.

In answer to an inquiry as to whether he at any time offered to give the conductor his ticket, he testified that he did not recall; that his expulsion was so quickly done and he was trying to explain and they would not give him time, saying "I doubt whether I ever thought of the ticket."

Plaintiff also introduced a fellow passenger who testified that he sat in the same seat with plaintiff until after the train left Louisa, about three miles below Walbridge, where plaintiff was ejected; that plaintiff was asleep all the time the witness sat with him; that if the conductor attempted to take up plaintiff's ticket, the witness did not remember it, nor did he recall whether he had left his seat for any length of time until they arrived at Louisa. This witness also testified that about the time the train left Louisa he moved across the aisle one seat ahead of plaintiff, and was sitting there when the conductor took hold of plaintiff to remove him, but the witness did not notice the conductor take hold of him, or hear the conductor say anything; that the first he noticed of the trouble, the "conductor had awakened Mr. Friend and had him on his feet in the aisle and was pushing him toward the front door of the car." So this evidence is of but little importance affecting the main issue.

The conductor testified that he made an effort to obtain plaintiff's ticket three times; his testimony on that point being as follows:

"I went to him for his ticket somewhere between Big Sandy Junction and Buchanan. The train was pretty well crowded. He seemed to be asleep and apparently

to me was intoxicated, and I shook him, and he didn't give any response. He was sitting with his head down this way sleeping; and there was a right smart crowd and I didn't have much time to contend with him. I thought he was drinking and I thought I would fetch him to Louisa and have him taken off for being drunk. I went on and worked the train, and after I passed Fullers I went back again and shook him and got no response. When I come to Louisa I got off and looked for the marshal and couldn't see anything of him, and I had the orders to get and everything was heavy that day, so when I got the orders, the thing slipped my memory to have him taken off. I didn't see anybody to take him off. It slipped my memory. I worked the train leaving there and found him still sitting there, sleeping before I got to Walbridge; and when I got there I picked him up and carried him and pushed him ahead of me to the door and put him off; shook him at first to get his ticket and see where he was going."

In his testimony as to his having made efforts to obtain plaintiff's ticket, the conductor is contradicted by no one and is corroborated by Rev. O. F. Williams, the Presiding Elder above mentioned, as to the first or second time the conductor went through the train after leaving Catlettsburg. The plaintiff himself does not deny this testimony, but says if the conductor ever tried to rouse him he did not know of it.

At the close of all the evidence the defendant moved the court to instruct the jury to find a verdict for it, and of the court's refusal to grant this motion it now complains, insisting that the weight of the evidence authorized an instructed verdict; but the question is, whether taking the evidence for plaintiff as true, he was entitled to a recovery under the law.

1. It was said by this court in McKinley v. L. & N. R. R., 137 Ky., 845, 127 S. W., 483, 28 L. R. A. (N. S.), 611:

"This court has frequently upheld the right of carriers to eject passengers where they fail to produce a ticket or to pay fare. As was said in Flood v. Ches. & Ohio Ry. Co., 80 S. W., 184, 23 R., 2135, 'One who enters a passenger train and refuses to pay fare becomes a trespasser and may be ejected by the conductor.' Of course, if in putting the passenger off the train, the conductor uses any unnecessary force or offers to the pas-

senger any insult or indignity or ejects him from the train at a time and place where serious injury would likely result to him, the company would be liable—not for putting him off, but for the manner in which it was done.''

And the general rule is that where a passenger has refused to tender a ticket or to pay fare, and has been in part ejected from the train, as where the carrier's servants have signalled for the stopping of the train for the purpose of ejecting the passenger, the passenger can not then tender a ticket or offer to pay fare, and thus entitle himself to transportation and thereby render his ejection from the train a wrongful act. L. & N. v. Breckinridge, 99 Ky., 1, 17 R., 1303, 34 S. W., 702; 6 Cyc., 554; 31 L. R. A. (N. S.), 992, note.

It is apparent, therefore, that if appellee failed to tender a ticket or to pay fare after a proper demand therefor by the conductor, the conductor had a right to eject him and appellee can not recover, for the conductor used no more force than was necessary, offered to appellee no insult or indignity, and did not eject him at a time and place likely to result in serious injury to him. So the question is, did appellee within the meaning of the rule stated, fail to produce a ticket or to pay fare after proper demand made therefor?

In considering this question, it is necessary to determine what is required of a conductor to constitute proper demand for the ticket or fare of a sleeping passenger. That he should make a reasonable, and under unusual circumstances an extraordinary effort to rouse the passenger must be conceded.

But to hold an ejection wrongful where a person has boarded a train and gone to sleep and permitted the conductor to make a reasonable effort on at least three occasions to rouse the passenger, and has then suffered himself to be raised out of his seat and to be pushed almost the entire length of a passenger coach and out on the platform, without tender of ticket or offer to pay fare, as was done in this case, would be an invitation to the unscrupulous to impose upon carriers and an assurance of reward for such imposition.

There might be circumstances requiring unusual or extraordinary efforts upon the part of the conductor to arouse a sleeping passenger; as under conditions where a passenger is suffering from a malady of such nature

that the person is not easily roused, or has been without sleep for an unusual length of time, or is exceptionally difficult to wake, or conditions of like nature. In such cases the failure to respond to the effort of the conductor may be explained.

But no excuse is offered or explanation is given of the plaintiff's exceptionally deep sleep except that he had had "a few drinks along through the day and along the night before," and had been up until between two and three o'clock of that morning, and that it required "outside air" to wake him.

The court is, therefore, of the opinion that the demand made upon plaintiff by the conductor for his fare was a proper and sufficient demand; and, plaintiff having failed to tender his ticket or offer to pay fare, was lawfully ejected from the train. The trial court should have granted the motion to instruct the jury to find a verdict for the defendant.

2. It was also insisted by appellant company that the damages awarded were excessive. In view of the holding of the court as to plaintiff's want of right to recover in any sum, this question is immaterial; but in the following somewhat similar cases the amounts indicated were held excessve.

In C., N. O. & T. P. Ry. Co. v. Carson, 145 Ky., 81, 140 S. W., 71, four hundred dollars; in Southern Ry. v. Hawkins, 121 Ky., 415, 89 S. W., 258, 28 R., 364, one thousand dollars; in L. & N. v. Breckinridge, 99 Ky., 1, five hundred dollars; in L. & E. Ry. v. Lyons, 104 Ky., 23, 46 S. W., 209, 20 R., 516, two hundred and sixty dollars; in L. & N. v. Fish, 127 S. W., 519, five hundred dollars; and in Camden Interstate, &c. v. Frazier, 97 S. W., 776, 30 R., 186, five hundred dollars.

Judgment reversed; whole court sitting.